IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ANGELINA L. LEON,<br><br>               Plaintiff,<br><br>vs.<br><br>ANDREW SAUL, Commissioner of<br>the Social Security Administration,<br><br>               Defendant. | CV 18-94-BLG-TJC<br><br><br>**ORDER** |

Plaintiff Angelina L. Leon ("Plaintiff") has filed a Complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security (the "Commissioner") regarding the denial of her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. (Doc. 2.) The Commissioner has filed the Administrative Record ("A.R.").[1] (Doc. 9.)

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of Defendant's denial and remand for an award of disability

---

[1] The Court notes that Plaintiff's counsel does not cite to the page numbers supplied by the agency in the A.R. Rather, counsel cites to the page numbers electronically assigned by the Court's electronic filing system. This creates unnecessary confusion for both opposing counsel and the Court. (*See* Doc. 16 at 4, n.1.) Plaintiff's counsel is therefore directed to cite to the page numbers as they appear in the A.R. in all future filings with this Court.

benefits, or alternatively for further administrative proceedings.  (Doc. 11.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 16, 17.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court finds the ALJ's decision should be **REMANDED** for further proceedings.

## I.  PROCEDURAL BACKGROUND

Plaintiff filed applications for disability insurance benefits and supplemental security income on March 24, 2015.  (A.R. 194-206.)  Plaintiff initially alleged she had been unable to work since March 13, 2015 due to her disabling conditions.  (A.R. 194.)  But she subsequently amended her onset date to September 10, 2015.  (A.R. 189.)  The Social Security Administration denied Plaintiff's applications on August 7, 2015, and upon reconsideration on December 18, 2015.  (A.R. 73-122.)

Plaintiff requested a hearing before an Administrative Law Judge.  (A.R. 134-35.)  Administrative Law Judge Lloyd E. Hartford (the "ALJ") held a hearing on November 7, 2016.  (A.R. 32-72.)  At the hearing, Plaintiff confirmed that she wished to amend her alleged onset date to September 2015, and the ALJ granted the request.  (A.R. 36-38.)  On February 13, 2017, the ALJ issued a written decision finding Plaintiff not disabled.  (A.R. 16-26.)

Plaintiff requested review of the decision, and on April 11, 2018, the

Appeals Council denied Plaintiff's request for review. (A.R. 1-6.) Thereafter,

Plaintiff timely filed the instant action.

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial

review of the Commissioner's final agency decision. 42 U.S.C. §§ 405(g),

1383(c)(3). The scope of judicial review is limited. The Court must affirm the

Commissioner's decision unless it "is not supported by substantial evidence or it is

based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). *See

also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may

reverse the ALJ's decision to deny benefits only if it is based upon legal error or is

not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human

Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a

preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d

1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which,

considering the record as a whole, a reasonable person might accept as adequate to

support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a

whole, the Court must weigh both the evidence that supports and detracts from the

ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

### B.     Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) she suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other substantial gainful employment which exists in the national economy. 42 U.S.C.

§§ 423(d)(1)(A), 423(d)(2)(A).  A claimant must meet both requirements to be classified as disabled.  *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process.  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin*., 223 F.3d 968, 974 (9th Cir. 2000)).  The five steps are:

1. Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

5. Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett v. Apfel*, 180 F.3d 1094, 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

## III. FACTUAL BACKGROUND

### A. The Hearing

A hearing was held before the ALJ in Billings, Montana on November 7, 2016. (A.R. 32-72.) Plaintiff testified she currently works part-time. (A.R. 51.) She is employed through a program called Experience Works, which is a work program for individuals over age 55. (A.R. 53.) Through that program, Plaintiff works at the Montana Rescue Mission approximately 20 hours per week sorting and pricing linens. (A.R. 51-53.) Plaintiff stated that her diabetes, arthritic feet and her knee pain prevent her from working more than part-time. (A.R. 65-66.) At one point, Plaintiff applied to work directly for the Rescue Mission. (A.R. 54.) But she was not hired because she cannot stand to cashier or lift large bags of donations. (A.R. 54-55.)

As to her physical limitations, Plaintiff testified that she cannot stand more than ten to fifteen minutes at a time because her feet hurt, and her knees swell. (A.R. 55.)  She also cannot sit for an extended period of time because her back hurts and her legs cramp.  (A.R. 55.)  She estimated the longest she can sit is an hour and a half.  (A.R. 57.)  Plaintiff stated that she is allowed to sit and stand at will while she works at the Rescue Mission.  (A.R. 50.)  Plaintiff indicated she also has difficulty with stairs, and that she can only walk about 25 feet before she needs to take a break.  (A.R. 57.)  Plaintiff stated she does not lift more than 20 pounds. (A.R. 59.)  Plaintiff uses an electric cart to buy groceries because she cannot get around the store without the assistance.  (A.R. 57.)

Plaintiff testified that on a typical work day she gets up around 6:00 a.m. (A.R. 62.)  It takes her about two hours to get ready for work, and during this time has to take 3 to 4 rest breaks. (A.R. 63.)  Plaintiff's shifts are usually three to five hours long.  (A.R. 55.)  Plaintiff indicated that after a five-hour work day, she is very tired and has to rest.  (A.R. 55.)  She usually goes home and lays down for 20 to 30 minutes.  (A.R. 59.)  She then prepares something to eat, and then lays back down for another 20 to 30 minutes.  (A.R. 60.)  Afterward, she will do dishes and then go to bed between 7:00 and 8:00 p.m.  (A.R. 60.)

At the beginning of the hearing, the ALJ asked Plaintiff's counsel whether she was aware of any additional medical records that she wanted to submit after

the hearing.  (A.R. 35.)  Plaintiff's counsel indicated there may be an additional x-ray report from August 2015 that she was going to try and obtain.  (A.R. 35.)  In response, the ALJ noted that another one of Plaintiff's medical records from August 2016 also referenced an x-ray of Plaintiff's knees, but that he was unable to find the x-ray report in the file.  (A.R. 35.)  Plaintiff's counsel indicated she would obtain both x-ray reports.  (A.R. 36.)

Plaintiff's counsel also advised the ALJ that Plaintiff had amended her onset date.  (A.R. 36.)  Counsel explained that Plaintiff was having problems with her knees, but the issues got worse after she experienced a fall in September 2015.  (A.R. 37.)  Therefore, she amended her onset date to September 10, 2015.  (A.R. 37-38; 189.)  The ALJ granted Plaintiff's request, stating "I'll grant your motion to amend the onset date to that."  (A.R. 38.)

Following these exchanges with counsel, the ALJ asked Plaintiff whether she had undergone knee replacement surgery.  (A.R. 44.)  She said she had not.  (A.R. 44.)  Plaintiff explained that she needed to wait to have surgery until she retired or received some kind of income.  (A.R. 44.)

The ALJ then asked Plaintiff about her alleged onset date.  (A.R. 45.)  Plaintiff explained that she originally selected March 13, 2015 because she was having issues with her diabetes and her feet.  (A.R. 45.)  Around that time, Plaintiff was working at HRDC, but lost her job because of lack of funding.  (A.R. 45-46.)

She indicated her knees were not hurting severely at that time.  (A.R. 46.)  In September 2015, however, Plaintiff fell while walking up some stairs.  (A.R. 46.)  As a result, her right knee swelled, and she was in severe pain.  (A.R. 46.)  At that point, she began seeking more medical treatment for her knees, including physical therapy.  (A.R. 46.)  Plaintiff testified that she was re-hired at HRDC as a receptionist in October 2015.  (A.R. 48.)  The job required her to stand more than three-fourths of the day, which caused her knee to swell severely.  (A.R. 49.)  Plaintiff tried cutting her hours to part-time.  (A.R. 49.)  At the end of her probationary period in November 2015, however, she was let go because she was not able to do the job.  (A.R. 49.)

At the close of the hearing, the ALJ stated: "I'm going to give counsel 14 days to obtain those X-rays of your knees.  And as I noted, I believe on the record earlier, if those X-rays confirm what the doctor said in Exhibit 6F, and I believe it was 13F, then I'll find you disabled based on those exhibits because I don't imagine both doctors would have recommended a total knee replacement if the X-ray did not show severe conditions."  (A.R. 71.)

/ / /

/ / /

/ / /

/ / /

## B.    Medical Evidence[2]

### a.    *Christopher Baumert, M.D.*

Plaintiff has seen Dr. Baumert since at least January 2014.  (A.R. 493.)  In February 2015, Dr. Baumert noted Plaintiff had chronic ankle pain.  (A.R. 453.) He diagnosed her with degenerative joint disease in her ankle and foot, pes planus (flat feet) of both feet, and noted she was overweight.  (A.R. 454.)

On June 3, 2016, Dr. Baumert noted Plaintiff's right knee pain was worsening due to inversion of her ankle as a result of wearing old shoes.  (A.R. 587.)  Dr. Baumert indicated Plaintiff was not a candidate for a total knee replacement on her right knee until she weighed less than 250 pounds.  (*Id.*)

On July 13, 2016, Plaintiff complained of right knee pain and left ankle pain. (A.R. 595.)  Dr. Baumert indicated Plaintiff had seen Dr. Yorgason who recommended a right total knee replacement because he thought her knee pain was related to osteoarthritis of her knee, rather than her ankle issue.  (*Id.*)  At a follow-up appointment on September 14, 2016, Plaintiff continued to complain about knee pain, and Dr. Baumert noted Plaintiff has osteoarthritis, "needs replacement." (A.R. 599.)

---

[2] The administrative record includes Plaintiff's medical records from several health care providers over a lengthy period of time.  The Court has summarized only those records that are relevant to the specific issues presented for review.

b.    *Amy Kratz, M.D.*

Plaintiff saw Dr. Kratz on August 18, 2015 for left knee pain.  (A.R. 437.)

Plaintiff reported she had experienced left knee pain for over 25 years, and had

recently tried stretching her knees, which caused a shooting pain on the side of her

knee that had turned into a deep ache.  (*Id.*)  Dr. Kratz noted Plaintiff was able to

ambulate at that time without assistance.  (*Id.*)  Dr. Kratz's treatment note indicated

she reviewed an x-ray of Plaintiff's left knee.  (A.R. 438.)  Dr. Kratz stated the x-

ray showed "Severe joint medial compartment narrowing on the left with moderate

medial joint line narrowing on the right.  Osteophyte formation in the patella space

narrowing as well.  There is a valgus deformity, > on left than right."  (*Id.*)  Dr.

Katz diagnosed Plaintiff with bilateral osteoarthritis of the knees, and she

performed a joint injection on Plaintiff's left knee.  (*Id.*)

On October 1, 2016, Plaintiff saw Dr. Kratz for a right knee sprain.  (A.R.

432.)  Plaintiff explained that she had been walking up the stairs and injured her

right knee.  (*Id.*)  She reported increased swelling and pain with walking.  (*Id.*)

Plaintiff also reported improvement in her left knee since the injection at her last

visit, but said it still ached at times.  (*Id.*)  Dr. Katz stated Plaintiff likely

exacerbated her osteoarthritis.  (*Id.*)  She recommended physical therapy, but noted

"[h]owever in the long run she may require surgical treatment with knee

replacement."  (*Id.*)

In December 2018, Plaintiff had a follow-up appointment with Dr. Kratz. (A.R. 574.)  At that time, Plaintiff reported her knees were better, although she was not pain free.  (*Id.*)  She indicated physical therapy seemed to help.  (*Id.*)

       c.    *Matthew Giordanengo, D.O.*

Plaintiff saw Dr. Giordanengo on October 27, 2015 for a recheck of her right knee.  (A.R. 567.)  Plaintiff indicated she was still having pain and swelling in her right knee after injuring it while walking up the stairs.  (*Id.*)  Dr. Giordanengo stated he agreed with Dr. Kratz's assessment of osteoarthritis flare in her right knee.  (A.R. 569.)  He stated Plaintiff would likely benefit from continued physical therapy and weight loss.  (*Id.*)  He further stated Plaintiff "will likely require some surgical intervention in the future."  (*Id.*)

       d.    *Terrence J. Cahill, M.D.*

Plaintiff saw Dr. Cahill on September 22, 2015 for knee pain.  (A.R. 655.)  Dr. Cahill noted that Plaintiff reported she has had knee pain for many years, but it was getting worse.  (*Id.*)  Plaintiff told Dr. Cahill that two weeks prior, she had stepped hard accidentally on her right foot and felt a snap or a pop in her knee. (*Id.*)  She stated her right knee pain had been much worse since that time.  (*Id.*) Plaintiff reported that she had been limiting her activities due to her knee pain. (*Id.*)  Dr. Cahill recommended physical therapy, and indicated it was reasonable for Plaintiff to wear a knee brace.  (A.R. 658.)

In November 2015, Plaintiff had a follow-up appointment with Dr. Cahill. (A.R. 660.)  At that time, Dr, Cahill indicated she had made good progress with physical therapy and was going to transition to a home exercise program.  (A.R. 660, 663.)  Plaintiff reported she still had knee pain in both knees if she had been sitting for 20 minutes or more.  (A.R. 660.)  It was also noted that Plaintiff had obtained new orthotics, and Dr. Cahill recommended another brace, as well as possible injections in the future  (A.R. 663.)

Plaintiff saw Dr. Cahill again on January 27, 2016.  (A.R. 665.)  Plaintiff reported doing better since she got her braces.  (*Id.*)

       e.    *Clare Welch, PA-C*

On September 16, 2015, Plaintiff saw Clare Welch for knee pain.  (A.R. 435.)  Plaintiff reported that the prior week, she experienced sharp pain in the back of her right knee as she stepped up on a step.  (*Id.*)  Plaintiff reported having weakness, swelling, pain and pinching in the front of the knee.  (*Id.*)  Plaintiff also told Ms. Welch she had seen sports medicine for pain in her left knee, and was told she had significant arthritis in both knees.  (*Id.*)  Ms. Welch assessed Plaintiff with bilateral osteoarthritis in both knees, and stated Plaintiff likely exacerbated her arthritis.  (A.R. 436.)  She recommended ice and elevation and wrote a prescription for a knee brace.  (*Id.*)

On October 21, 2015, Ms. Welch noted that Plaintiff had started physical therapy and was continuing to have pain in her knees. (A.R. 563.) On November 11, 2011, Ms. Welch noted Plaintiff was continuing to do physical therapy, which had been helpful for her knee pain. (A.R. 570.) In March 2016, however, Ms. Welch noted Plaintiff was having ongoing bilateral knee pain, and it was limiting her daily activities. (A.R. 580.) Ms. Welch referred Plaintiff to orthopedics for an evaluation. (*Id.*)

   f. *John Wilson, M.D.*

On May 11, 2016, Plaintiff saw Dr. Wilson at Ortho Montana for evaluation of her bilateral knee pain. (A.R. 715.) Dr. Wilson noted Plaintiff had a 10 year history of knee pain and problems with her ankles. (*Id.*) He indicated the injections she had in her knees gave her little relief and caused her blood sugars to jump. (*Id.*) Dr. Wilson's treatment note stated that weightbearing x-rays of both knees were obtained. He stated both views "show loss of medial joint space – worse on right." (A.R. 716.) Dr. Wilson diagnosed Plaintiff with bilateral osteoarthritis of the knees. (A.R. 717.) Dr. Wilson stated "[f]or the knee, she will come to knee replacement." (*Id.*) He further stated that to minimize complications, Plaintiff's weight would need to be below 250 pounds. (*Id.*) Dr. Wilson referred Plaintiff to Dr. Yorgason for evaluation of her ankles. (*Id.*)

/ / /

g.    *Michael Yorgason, M.D.*

Plaintiff saw Dr. Yorgason at Ortho Montana on June 7, 2016.  (A.R. 718.)

Dr. Yorgason noted Plaintiff complained primarily of pain in her knees, followed

by pain in her left ankle.  (*Id.*)  Dr. Yorgason reviewed x-rays of her ankles that

had been taken in the office that day, and stated he did not believe her ankle pain

was causing her knee pain.  (A.R. 720.)  He recommended that Plaintiff proceed

with further evaluation of her knees.  (*Id.*)  He stated, "a right total knee

arthroplasty may make a better weight-bearing surface for her right foot and

ankle."  (*Id.*)  He indicated that if a total knee replacement did not completely

correct her issues, he could consider a further ankle surgery.  (*Id.*)

h.    *Dean Sukin, M.D.*

On August 5, 2016, Plaintiff saw Dr. Sukin at Ortho Montana for further

evaluation of her knee pain.  (A.R. 722.)  Dr. Sukin's treatment noted indicated x-

rays were obtained of Plaintiff's knees.  (A.R. 724.)  He stated "4 views bilateral

knees shows severe end-stage degenerative joint disease.  Severe medial

compartment is grade 4 and osteophytes and sclerosis."  (*Id.*)  Dr. Sukin diagnosed

Plaintiff with degenerative joint disease, both knees, "severe end stage."  (*Id.*)  He

discussed surgical options with Plaintiff and referred her to the weight loss clinic at

St. Vincent Healthcare.  (A.R. 724-25.)

Plaintiff returned to see Dr. Sukin on October 14, 2016. (A.R. 727.) At that point, Plaintiff stated her "pain is extreme." (*Id.*) Plaintiff told Dr. Sukin she wished to proceed with the total knee replacement surgery. (*Id.*) But she wanted to wait until March or April because she could not support herself if she had surgery at that time. (*Id.*) Dr. Sukin stated Plaintiff had "End stage Right Knee, failed all conservative [treatment]." (A.R. 728.)

### i. *Supplemental Evidence*

Following the hearing before the ALJ, Plaintiff's counsel sent a request to Ortho Montana, asking for the x-ray reports referenced by Dr. Wilson in May 2016 and Dr. Sukin in August 2016. (A.R. 755.) In response, Ortho Montana indicated it does not generate separate x-ray reports for x-rays that are taken in the office. (*Id.*) Rather, the doctor's treatment note is considered the x-ray report. (*Id.*) Plaintiff's counsel provided this information to the ALJ on December 6, 2016. (A.R. 756.)

After the ALJ entered his decision finding Plaintiff not disabled, Plaintiff's counsel submitted additional documents to the Appeals Council. (A.R. 192.) Although these documents were not made part of the record, counsel's letter indicates Plaintiff underwent knee replacement surgery on March 6, 2017. (*Id.*)

/ / /

/ / /

16

### C.    The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering

Plaintiff's claim.  First, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since the onset date of March 13, 2015.  (A.R. 18.)  The ALJ's

decision did not acknowledge that Plaintiff had amended her onset date to

September 10, 2015.  Second, the ALJ found that Plaintiff has the following severe

impairments: "left ankle fusion, bilateral pes planus (flat feet), osteoarthritis of the

knees, and morbid obesity."  (*Id.*)  Third, the ALJ found that Plaintiff does not

have an impairment or combination of impairments that meets or medically equals

any one of the impairments in the Listing of Impairments.  (A.R. 20-21)  Fourth,

the ALJ stated Plaintiff has the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and
> 416.976(a) except she can occasionally lift and/or carry 10 pounds
> and frequently lift and/or carry 10 pounds; she can stand and/or walk
> for a total of 2 hours in an 8 hour workday with normal breaks; she
> can sit for about 6 hours in an 8 hour workday with normal breaks;
> she can occasionally climb ramps and stairs; she can never climb
> ladders, ropes, or scaffolds; she can occasionally balance, stoop, and
> crouch; she can never kneel or crawl; and she must avoid concentrated
> exposure to extreme cold and hazards (machinery, heights, etc.)

(A.R. 21.)

The ALJ next found that Plaintiff was able to perform her past relevant work

as a customer service representative or receptionist.  (A.R. 25.)  Thus, the ALJ

found that Plaintiff was not disabled.  (A.R. 25.)

## IV.   DISCUSSION

Plaintiff argues that the ALJ erred in the following ways: (1) improperly discounting the opinions of her treating physicians that established a need for a total knee replacement due to severe end stage osteoarthritis; (2) ignoring the amended onset date in finding Plaintiff not credible; (3) improperly discrediting her testimony; and (4) failing to incorporate all of her impairments into the vocational consultant's hypothetical questioning.

### A.   Consideration of the Treating Physicians' Opinions

Plaintiff contends that the ALJ failed to give proper weight to the findings and diagnoses of Dr. Christopher Baumert, M.D., Amy Kratz, M.D., Matthew Giordanegngo, D.O., Terrence J. Cahill, M.D., Clare Welch, PA-C, John Wilson, M.D., Michael Yorgason, M.D., and Dean Sukin, M.D.  In response, the Commissioner argues Plaintiff fails to show any error with regard to the treating physicians.

In assessing a disability claim, an ALJ may rely on "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995.)  The Commissioner applies a hierarchy of deference to these three types of opinions.  The opinion of a treating doctor is

generally entitled to the greatest weight. *Id.* ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."); *see also* 20 C.F.R. § 404.1527(c)(2). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830.

"The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id. See also Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.").

If the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques, or is inconsistent with other substantial evidence in the record, it is not entitled to controlling weight. *Orn v. Astrue*, 495 F.3d 625, 631-32 (9th Cir. 2007) (quoting Social Security Ruling 96-2p). In that event, the ALJ must consider the factors listed in 20 C.F.R.

§ 404.1527(c) to determine what weight to accord the opinion. *See* Social Security Ruling 96-2p (stating that a finding that a treating physician's opinion is not well supported or inconsistent with other substantial evidence in the record "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."). The factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6) any other factors brought to the ALJ's attention that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(I)-(ii), (c)(3)-(6); *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017).

Opinions of treating physicians may only be rejected under certain circumstances. *Lester,* 81 F.3d at 830. To discount an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons." *Id.* To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)*; Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ can accomplish this by setting forth "a

detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Reddick*, 157 F.3d at 725. "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831. However, "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

In his decision, the ALJ summarized Plaintiff's medical records, including treatment notes from Dr. Baumert, Dr. Kratz, Dr. Giordanengo, Dr. Cahill, Ms. Welch, Dr. Wilson, Dr. Yorgason, and Dr. Sukin. (A.R. 22-24.) The ALJ did not however, indicate what weight, if any, he gave to their findings. The Court notes that generally treatment notes do not constitute medical opinions the ALJ must weigh if the notes do not offer opinions regarding Plaintiff's limitations or ability to work. *See* 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.");

*Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (holding that where physician's report did not assign any specific limitations or opinions regarding the claimant's ability to work, "the ALJ did not need to provide 'clear and convincing reasons' for rejecting [the] report because the ALJ did not reject any of [the report's] conclusions."). In the circumstances of this case, however, the Court finds the ALJ's failure to address the records of Dr. Wilson and Dr. Sukin was erroneous.

At the hearing, the ALJ specifically stated he would find Plaintiff disabled based on the treatment notes from Dr. Wilson and Dr. Sukin of Ortho Montana that referred to x-rays of Plaintiff's knees, if the x-ray reports confirmed their opinions that Plaintiff needed a total knee replacement. (A.R. 71 ("if those x-rays confirm what the doctor said . . . then I'll find you disabled").) Following the hearing, Plaintiff's counsel provided information to the ALJ explaining that no separate x-ray reports were available. Counsel advised the ALJ that Ortho Montana does not generate separate x-ray reports for x-rays that are taken in their office. Rather, Ortho Montana explained that for "images taken at Ortho Montana the report is in the office note. No report generated separately, the office note is the report for the images taken at Ortho Montana." (A.R. 755.) As such, the treatment notes themselves also served as the x-ray reports. Therefore, the ALJ already had in his possession the objective findings he was requesting.

Despite this explanation, the ALJ determined Plaintiff was not disabled. But in doing so, the ALJ did not explain why the supplemental information Plaintiff's counsel provided was insufficient to confirm the doctors' opinions that Plaintiff needed a total knee replacement. It appears the ALJ may have either made a mistake, ignored the fact that the objective findings did indeed confirm the doctors' opinions, or had a change of heart and no longer found the treatment notes supported a finding of disability. Regardless, the ALJ simply did not give any explanation for rejecting the findings in Dr. Sukin and Dr. Wilson's treatment notes.

An ALJ may find a treating physician's opinion is not entitled to controlling weight on the basis that it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques. *Orn*, 495 F.3d at 631-32 (9th Cir. 2007). Here, however, the ALJ did not make any such finding. Further, as noted above, even if a treating physician's opinion is not given controlling weight, "[t]he ALJ is required to consider the factors set out in 20 C.F.R. § 404.1527(c)(2-6) in determining how much weight to afford the treating physician's medical opinion." *Ghanim*, 763 F.3d at 1161. The failure to consider these factors "constitutes reversible legal error." *Trevizo*, 871 F.3d at 676. The ALJ also did not address these factors in his written decision.

Accordingly, the Court finds the ALJ erred with respect to the treating physicians' opinions.

**B.     The ALJ's Credibility Determination**

Plaintiff argues the ALJ improperly ignored the amended onset date to find her not credible.  Plaintiff further argues the ALJ's credibility determination was erroneous because the ALJ failed to provide specific, clear and convincing reasons for rejecting her testimony.  The Commissioner counters that the ALJ properly discounted Plaintiff's symptom testimony.

The credibility of a claimant's testimony is analyzed in two steps.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.*  Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if he provides "specific, clear and convincing reasons" for doing so.  *Id.*  "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'"  *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).  "General findings are insufficient; rather, the ALJ must identify what testimony is

not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)).

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques, (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). An ALJ may also take the lack of objective medical evidence into consideration when assessing credibility. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

Here, the first step of the credibility analysis is not at issue. The ALJ properly determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, and there is no argument that Plaintiff is malingering. Therefore, the ALJ was required to provide clear and convincing reasons for rejecting Plaintiff's testimony regarding her symptoms. The Court finds the ALJ failed to do so.

The ALJ discounted Plaintiff's testimony on grounds that she made inconsistent statements about the reason she left her job and because her testimony regarding her limitations was disproportionate to the clinical findings in the medical record. (A.R. 19, 22, 24.) Upon closer scrutiny, however, the purported inconsistencies the ALJ cited are not supported by the record.

First, the ALJ's finding that Plaintiff gave "inconsistent" reasons for leaving work is not supported by the record. (A.R. 22.) The Commissioner concedes this point. (Doc. 16 at 8.) The ALJ stated: "In a May 2015 treatment record, it was noted that the claimant lost her job as a receptionist 'for budget reasons.' However, the claimant alleged in other parts of the record that she lost her job due to her medical conditions, which is inconsistent." (A.R. 22.) The record does not support the ALJ's reasoning. Plaintiff testified at the hearing that she lost her job the first time in May 2015 due to budget reasons. (A.R. 45, 48.) She then attempted to return to work in October 2015, and lost her job the second time due to her physical limitations. (A.R. 48-49.) Plaintiff specifically amended her alleged onset date to reflect that she was not alleging disability based on the first time she lost her job. (A.R. 37, 46.) Thus, there was simply no "inconsistency" in her testimony. The ALJ's determination to the contrary fails to acknowledge the amended onset date.

Second, the ALJ stated the clinical findings were disproportionate to Plaintiff's complaints about her lower extremities. (A.R. 24.) This is curious because the ALJ clearly indicated at the hearing he would find Plaintiff disabled based on the same clinical findings, which indicates he had no reservations about her credibility. (A.R. 71.) Nevertheless, the ALJ wrote that Plaintiff lacked credibility because she "has seen improvements in her overall physical health

functioning with physical therapy and personal exercise." (A.R. 24.) The Court finds the ALJ's determination in this regard is not supported in light of the objective medical tests that showed Plaintiff had "loss of medial joint space – worse on right" and would "come to knee replacement" (A.R. 716-17), and that she had "severe end-stage degenerative joint disease" (A.R. 724), had "failed all conservative [treatment]," and was ready to "proceed with TKA [total knee replacement] in March 2017." (A.R. 728.) Further, Plaintiff underwent knee replacement surgery after the hearing, which confirms the clinical findings. (A.R. 192.)

Accordingly, the Court finds the ALJ's credibility finding is not supported by specific, clear, and convincing reasons that are based on substantial evidence in the record.

### C. The ALJ's Failure to Incorporate Impairments into Hypothetical Questions Posed to the Vocational Expert.

Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d 747, 756 (9th Cir. 189) (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)). If the assumptions in the hypothetical are not supported by the record, then the

vocational expert's opinion that the claimant has a residual working capacity has no evidentiary value. *Embrey*, 849 F.2d at 422

Plaintiff argues that the hypothetical the ALJ relied on to find she could perform her past relevant work was deficient because it did not incorporate all of her limitations. As discussed above, the Court has determined the ALJ failed to properly consider the treating physicians' opinions and failed to adequately support his credibility finding. Accordingly, these errors infected the hypothetical the ALJ relied on, and in turn, the ALJ's determination that Plaintiff could perform her past relevant work.

Therefore, the Court finds the ALJ's determination at step five is not supported by substantial evidence.

## V.    REMAND OR REVERSAL

Plaintiff asks the Court to remand this case for payment of benefits. "The decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court." *Reddick*, 157 F.3d at 728. Remand for an award of benefits is appropriate if: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinions; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the

claimant disabled on remand." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir.

2014) (setting forth three-part credit-as-true standard for remanding with

instructions to calculate and award benefits). But where there are outstanding

issues that must be resolved before a determination can be made, or it is not clear

from the record that the ALJ would be required to find a plaintiff disabled if all the

evidence were properly evaluated, remand for further proceedings is appropriate.

*See Benecke v. Barnhart*, 379 F.3d 587, 595-96 (9th Cir. 2004); *Harman v. Apfel*,

211 F.3d 1172, 1179-80 (9th Cir. 2000).

Here, in light of the foregoing discussion, it certainly appears possible that

no useful purpose would be served by further administrative proceedings. The

record is fully developed. As noted, the ALJ failed to provide any legally

sufficient reasons for his adverse credibility finding or for rejecting Dr. Wilson and

Dr. Sukin's opinions. If the improperly credited evidence discussed above were

properly credited and the RFC formulated accordingly, it appears the ALJ would

be required to find Plaintiff disabled. The ALJ has already stated he would find

Plaintiff disabled if the objective x-ray findings confirmed her treating physicians'

opinions that she needed a total knee replacement. The clarification provided by

Ortho Montana regarding their records appears to establish that the x-rays

confirmed the doctor's opinions. Thus, it is possible that remand for further

proceedings would add nothing.

Nevertheless, as discussed above, the ALJ's decision may be based on his reconsideration of the medical evidence following the hearing, and his determination that the treatment notes did not support a finding of disability. If so, it is not clear from the record that the ALJ would be required to find a plaintiff disabled if all the evidence were properly evaluated. The ALJ should be given the opportunity to clarify his decision.

The Court therefore finds remand for further proceedings is appropriate. On remand, the ALJ shall either award benefits consistent with his statement at the hearing, or reconsider the weight to be applied to Dr. Sukin and Dr. Wilson's opinions and evaluate the Plaintiff's credibility in accordance with this decision.

## V.     CONCLUSION

Based on the foregoing, **IT IS ORDERED** that the Commissioner's decision be **REVERSED,** and this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order. **IT IS ORDERED**.

DATED this 26th day of October, 2019.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge